UNITED STATES DISTRIC COURT
SOUTHERN DISTRICT OF NEW YORK

HONGYING ZHAO, JUAN LIU, SHENSI HE,
HONGLEI TIAN, HAIYAN WANG, JINMEI
WANG, YIHE SUN, SHAOMIN LU, GE GAO,
KUNYUN ZHANG, FENGWEI WANG,
DANDONG WU, XIAOLI WANG, PENG WANG,
YIMIN YANG, JINGRUI FENG, LING SHEN,
CUIRONG LI, HUI ZHENG, CHANGLI XIAO,
QIUYUE ZU, XIUHUA WANG, XIAOYUN
ZHANG,       JINLI QIN, SHUYAN FENG,
KANWEN ZHANG and QIAN LU,

                                    Plaintiffs,

                    -against-

JPMORGAN CHASE & CO. and JPMORGAN
CHASE BANK, N.A.,

                                    Defendants.

Docket No.:

**COMPLAINT
and
DEMAND FOR JURY TRIAL**

Plaintiffs Hongying Zhao, Juan Liu, Shensi He, Honglei Tian, Haiyan Wang, Jinmei Wang, Yihe Sun, Shaomin Lu, Ge Gao, Kunyun Zhang, Fengwei Wang, Dandong Wu, Xiaoli Wang, Peng Wang, Yimin Yang, Jingrui Feng, Ling Shen, Cuirong Li, Hui Zheng, Changli Xiao, Qiuyue Zu, Xiuhua Wang, Xiaoyun Zhang, Jinli Qin, Shuyan Feng, and Kanwen Zhang and Qian Lu, by and through their attorneys, Michael J. Kapin, P.C., for their Verified Complaint, respectfully sets forth as follows:

1.       Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     NATURE OF ACTION

2.      By this complaint, Plaintiffs bring claims for Defendant JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A.'s (collectively "JPMC") actual knowledge of and participation in a breach of trust, aiding and abetting embezzlement, aiding and abetting breach of fiduciary duty, aiding and abetting conversion, and unjust enrichment.

3.      Attached herein as **Exhibit A** is the First Amended Summons and Complaint filed by Plaintiffs in the Supreme Court of the State of New York, County of New York (the "State Court Complaint").

4.      Plaintiffs incorporate herein by this reference, each and every allegation set forth in the State Court Complaint.

5.      Each of the Plaintiffs invested in various "Bar Works" entities, including Bar Works Chambers St, Inc., Bar Work Tribeca Inc, Bar Works San Francisco 1, LLC, Bar Works Metropolitan Ave, Inc and Bar Works Eighth Avenue Inc (collectively the "Bar Works Entities"), as part of what they thought was a legitimate investment in co-working location retail establishments.

6.      Non-party Renwick Robert Haddow, a national of the United Kingdom, was the mastermind of this scheme. Haddow formed the various Bar Works entities and used them to perpetrate a massive Ponzi scheme upon the Plaintiffs.

7.      Each of the Plaintiffs was specifically advised to send their investment proceeds to Bar Works Inc.'s bank account at Defendants' JPMorgan Chase bank, believing that to be a sign that the "Bar Works" organization consisted of a reputable business.

8.      Defendants knew that the Bar Works Entities was an elaborate Ponzi Scheme.

9. Defendants had before it the very nuts and bolts of the Ponzi scheme: the vast majority of the money Plaintiffs (and other investors) deposited into Bar Works Inc.'s main account was not used to build out shared co-working workspace retail locations, but instead was merely transferred to other customers in patterns that could serve no legitimate business purpose.

10. Defendants had actual notice that Bar Works was operating with a managing director named "Jonathan Black" who was completely fictitious.

11. Defendants had actual notice that the principal of the "Bar Works" entities was not a Jonathan Black, but rather was in fact Haddow.

12. Defendants had actual notice of the following information about Haddow:

(a) In or about November 2008, the Companies Investigation Branch of the Insolvency Service of the United Kingdom ("CIB"), an agency responsible for investigating serious corporate abuse in the United Kingdom (the "U.K."), disqualified Haddow, from serving as a director of any company registered in the U.K. for a period of eight years, through about November 2016. According to an online press release published by a U.K. government and public sector news alerting service in or about December 2008, Haddow had served as a director of a failed U.K. company whose investors lost all or substantially all of their investments. As set forth in the release, as part of his disqualification, Haddow consented to a schedule of unfit conduct that stated, in part and substance, that Haddow caused or allowed the now-insolvent company to make various misleading statements about its financial position and prospects.

(b) In July 2013, the U.K.'s Financial Conduct Authority ("FCA") brought a civil action against Haddow and others for allegedly running various unauthorized

collective investment schemes that raised £16.9 million in funds through, among other things, misleading statements to investors.

(c) In February 2014, the High Court of Justice, Chancery Division, ruled, in substance, that the schemes at issue were in fact unauthorized collective investment schemes. The ruling was publicized in the British press.

(d) In March 2015, the British Court of Appeal dismissed the appeals filed by Haddow and others. The ruling was publicized online. According to the FCA's public website, a trial on the remaining issues is forthcoming.

13.     Defendants had actual notice that investors who were investing in corporations other than Bar Works Inc., were sending their money to a single account at Defendants related to the entity Bar Works Inc., and that the proceeds of the Bar Works Entities were being co-mingled.

14.     Defendants had actual notice that Haddow was using investors' money, including the Plaintiffs' money, on lavish personal expenditures totaling hundreds of thousands, if not millions of dollars, which served no legitimate business purpose to the Bar Work Entities' office share co-working retail business.

15.     Defendants had actual notice that Haddow was selling units of co-working space in excesses of the number of units actually being built.  Upon information and belief, Defendants actually visited the purported Bar Works Entities locations and were able to verify that Haddow was raising more investment units than actual built spaces existed or ever intended to exist.

16.     Defendants had actual notice that Haddow was laundering investors', including the Plaintiffs', money, as a result of Bar Works Inc. deposits being immediately transferred out of the business operating account.

17.     Defendants had actual notice that Haddow was laundering investors', including the Plaintiffs' money, as a result of Bar Works Inc.'s deposits being immediately transferred to known overseas money laundering havens such as Mauritius, the Seychelles and Morocco.

18.     Upon information and belief, Defendants, in addition to having actual knowledge, were notified by multiple red flags as to the likelihood of money laundering by Haddow.

19.     Through meetings with Haddow, visits to the "Bar Works" locations and based on the information contained in JPMC's "Know Your Customer" file, JPMC had actual notice that the Bar Works Entities were not part of a legitimate business enterprise.

20.     JPMC had everything it needed to unmask and stop the fraud– it had unique information from which it could have reached only one plausible conclusion: Haddow was a thief.

21.     Haddow only accepted investments via wire transfer, which were directed to Account # XXXX622 at Defendants' Chase Bank in Manhattan (the "622 Account"). The 622 Account belonged to Bar Works Inc.

22.     Bar Works Inc.' victims included mostly foreign individuals, who invested some if not all of their life savings into one of the Bar Works Entities co-working retail locations.

23.     JPMC permitted all funds from putative investors to be commingled in a single account and permitted Haddow to withdraw the funds as he saw fit, without limitation.

24.     JPMC allowed Haddow to funnel millions of dollars through the 622 Account by ignoring clearly illicit transaction activity within that account – including millions of dollars in suspicious transactions from all over the world – and disregarding its own anti- money laundering policies. Rather than put a stop to the crime that it knew was taking place, JPMC continued to participate in the crime as JPMC's drive for fees and profits became a substitute for common sense, ethics and legal obligations.

25.     This was not the first time JPMC ignored evidence of fraud in order to garner revenue.

26.     In 2003, JPMC had been accused of the same sort of conduct in connection with the Enron fraud.

27.     In addition, within the last few years, after the collapse of Bernie Madoff's Ponzi Scheme, several class action lawsuits were filed by investors against JPMorgan Chase for their involvement.

28.     Upon information and belief, while it may seem surprising that Defendants could have known about the "Bar Works" scheme and continued to let it operate, Defendants made tens of thousands of dollar in transaction fees on the 622 account, an amount, which in proportion to the deposit size, made their illicit partnership with Bar Works Inc. and Renick Haddow more profitable than either the Enron or the Madoff schemes.

29.     Notably, Defendants' collected wire transfer fees, regularly representing such a large percentage of the wired amount, that Defendants were tipped off to the fact that Haddow was involved in a crime (i.e. because a legitimate business could not function paying such a high proportion of their revenues as wire transfer fees).

## II.     JURISDICTION AND VENUE

30.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §1332.  The Plaintiffs are all citizens and residents of the Peoples' Republic of China; there is complete diversity between the parties.

31.     Plaintiff Jinmei Wang's individual damages are in excess of $125,000.00. The Plaintiffs claim combined $3,050,000.00 in damages.

32.     Venue in this Court is proper under 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claim occurred within this district. Further, the Defendants are subject to the jurisdiction of this Court because their contacts are sufficient to subject them to this Court's personal jurisdiction.

## III.    PARTIES

33.     Plaintiffs are each individuals residing in the Peoples' Republic of China, and incurred losses and/or damages as a result of the activities alleged herein. Plaintiffs and/or their property and/or estate were injured as a result of the conduct alleged herein.

34.     Defendant JPMorgan Chase & Co. ("JPMorgan Chase") is a financial holding company incorporated under Delaware law with its principal place of business at 270 Park Avenue, New York, New York 10017. JPMorgan Chase is one of the largest banking institutions in the United States, with trillions of dollars in assets.

35.     JPMorgan Chase played a role in the Defendants' relationship with Bar Works Inc. JPMorgan Chase created and implemented anti-money-laundering policies that governed how the Defendants monitored the activity in the 622 Account.

36.     Defendant JPMorgan Chase Bank, N.A. ("Chase Bank") is one of JPMorgan Chase's main bank subsidiaries and is organized under the laws of the United States with its principal place of business at 111 Polaris Parkway, Columbus, Ohio 43240. Chase Bank is a national banking association in the United States with locations in many states, including a location in New York, New York.

37.     This Court has personal jurisdiction over all of the Defendants captioned herein. The Defendants have maintained minimum contacts with New York in connection with the claims alleged herein.

38.    The Defendants have: (a) intentionally taken full advantage of the rights, benefits and privileges of conducting business and/or transactions in the State of New York; (b) purposefully availed themselves of the laws of the State of New York by undertaking significant commercial activities in New York, and by receiving customer property to their benefit; (c) derived significant revenue from New York; (d) maintained minimum contacts and/or general business contacts with New York in connection with the claims alleged herein; and (e) committed tortious acts both within and without New York, causing injury in New York, and (i) regularly do or solicit business or engage in a persistent course of conduct or derive substantial revenue from goods used or consumed or services rendered in New York, or (ii) expect or should reasonably expect the acts to have consequences in New York and derive substantial revenue from interstate and international commerce.

39.    Plaintiffs bring this action against both Defendants because, upon information and belief, each Defendant, individually, participated in, promoted, aided and abetted the fraud. In addition, both Defendants operated as a single indivisible entity. Therefore, both of the Defendants is liable for the actions of the other Defendant.

## IV.    GENERAL ALLEGATIONS

40.    In an effort to hinder, delay or defraud authorities from detecting the Ponzi and embezzling scheme, Haddow did not register Bar Works Inc.'s securities to avoid SEC scrutiny that may have uncovered his true dealings, exposing the millions of dollars that flowed into Bar Works Inc. that Haddow used as his personal piggy bank.

41.    Upon information and belief, by the time the Ponzi scheme came to light on in 2017, investors had lost at least $35 million in principal.

42.     Had Defendants acted upon learning the Bar Works Entities were part of a Ponzi and embezzling scheme run by Haddow, the scheme would have been stopped sooner, or perhaps not been successful at all.

43.     JPMC knew Haddow was a thief and/or an embezzler.

44.     As a result of JPMC's involvement in the Enron collapse, JPMC entered into a written agreement with the Federal Reserve Bank of New York and the New York State Banking Department on July 28, 2003. The parties agreed their common goals were "that JPMC and its subsidiaries operate in compliance with applicable safety and soundness standards and federal and state laws, rules and regulations" and that "JPMC and its subsidiaries effectively manage their financial, operational, legal, reputational, and compliance risks."

45.     In connection with the settlement, District Attorney Robert Morgenthau released copies of a statement from JPMC pledging reform, and a letter he had sent to federal and state bank regulators detailing the results of the investigation. In that letter, Mr. Morgenthau noted that "[b]ankers – and the lawyers and accountants they employ – all *need to take off the blinders* and judge the appropriateness of interrelated transactions as a whole" rather than merely examine whether "each separate component of a set of interrelated transactions, viewed in isolation, falls within statutory and regulatory limits." (Emphasis added).

46.     JPMC was well positioned to see criminal activity because JPMC had access to vast amounts of personal information on Haddow and financial information about Haddow and Bar Works Inc. It was apparent from the transactions in the 622 Account that Haddow was not using the account to operate a legitimate business, but was, in fact, running a Ponzi Scheme.

47.     The unusual activity that was conducted in the 622 Account was visible to JPMC, which had to approve the negotiation of these large wire transfers. Such activity required further

investigation under relevant law and prudent business practices. It should have triggered not only investigation by the banker in charge of the account, but should also have triggered the bank's anti-money-laundering ("AML") monitoring system. Long before the passage of the USA Patriot Act in 2001 ("Patriot Act"), and with greater force after Congress passed the Patriot Act, banks such as JPMC were required to monitor their customers' transactions to detect and prevent money laundering and other suspicious activities. The Patriot Act reinforced this obligation and underscored the importance of implementing robust detection systems.

48.     What Haddow needed was a bank that would be willing to overlook his suspicious activity and ignore the anomalous account activity as well as notifications from its AML monitoring system.

49.     Haddow found that bank. JPMC ignored suspicious and inexplicable activity in the 622 Account, even, upon information and belief, when its monitoring system alerted JPMC to unusual activity.

50.     In return, JPMC earned tens of thousands of dollars in revenue from its relationship with Haddow.

51.     JPMC made money, Haddow made money, and the Ponzi/embezzling scheme's largest enablers made money, while Bar Works Inc.'s customers whose money was entrusted to JPMC lost millions of dollars.

52.     At all relevant times, JPMC knew that the 622 Account held the money of investors who had entrusted it to Bar Works Inc.'s JPMorgan Chase bank account.

53.     JPMC knew that Haddow and Bar Works Inc. owed fiduciary obligations to the Plaintiffs and other investors in the Bar Works Entities.

54.     As alleged herein, JPMC knew that Haddow and Bar Works Inc. were breaching their fiduciary obligations to the Plaintiffs and other investors in the Bar Works Entities.

55.     Upon information and belief, JPMC knew that all of the money was commingled in the 622 Account.

56.     The Bank Secrecy Act, the Patriot Act, and relevant New York laws and regulations required JPMC to file reports with appropriate regulators when it discovers suspicious activity by any of its customers. Such activity includes, *inter alia*, transactions where the bank has a substantial basis for believing a criminal violation is occurring, transactions involving potential money laundering, and transactions that have no business or apparent lawful purpose or are not the sort in which the particular customer would normally be engaging.

57.     As alleged in detail above, there were numerous suspicious transactions, which should have triggered investigations and reports to regulators, including but not limited to:

(a)     amounts being transferred internationally to 27 countries identified as major money laundering countries by the United States Department of State ("**Department of State**").  The Department of State categorizes countries into three separate categories: (1) Countries/Jurisdictions of Primary Concern;   (2)   Countries/Jurisdictions   of   Concern;   and   (3)   Other Countries/Jurisdictions Monitored.   The 27 countries where funds were transferred to are divided into the categories as follows:

(i)     funds transferred to 17 countries of Primary Concern,

(ii)     funds transferred to 8 countries of Concern, and

(iii)     funds transferred to 2 monitored countries;

(b)     international wire transfers totaling $3,846,320.63 to four major money laundering countries (Portugal, Cyprus, Spain, and Poland) even though there were no incoming deposits from those four countries. The absence of any incoming deposits from these four countries indicates that there were no investor funds and/or business derived from these four major money laundering countries. Cyprus and Spain are countries identified as countries of primary concern by the Department of State. Portugal and Poland are identified as countries of concern by the Department of State;

(c)     a disproportionate dollar amount of international wire transfers going to three major money laundering countries (Morocco, Isle of Man, and Mauritius) in comparison to the incoming deposit amounts coming from those three major money laundering countries. The Isle of Man is identified as a country of primary concern by the Department of State. Morocco is identified as a country of concern by the Department of State. Mauritius is identified as a monitored country by the Department of State. Specifically, $6,347,266.78 was transferred to these three major money laundering countries. However, the total amount of incoming deposits from these three major money laundering countries was $318,142.42. Further, the deposits were single deposits made in a single month in comparison to many multiple transfers made to these countries in the same month.

(d)     the disproportionality of the total amount transferred to Mauritius versus the total amount deposited from Mauritius. A total of $4,932,574.68 was transferred to Mauritius. However, only $30,000 was deposited from

Mauritius. Although Mauritius is identified as a monitored country by the Department of State, the activity of monetary transfers to Mauritius in comparison to the amount of deposits from Mauritius demonstrates highly suspicious activity. Therefore, it should have been monitored with a high level of scrutiny. Further, there were many transfers made to Mauritius ranging from $100,000 to $600,000 during the period from August 2016 through December 2016, which was the period when a high volume of deposits were being made into the account from many other countries other than Mauritius; and

(e) overall, during the period from August 2016 through December 2016, as the volume of deposits made into the account from across the globe increased, the amount of transfers to the 27 major money laundering countries increased and spiked significantly.

58. Plaintiffs have no reason to believe that Defendants made reports to federal or state regulators concerning suspicious activity in the 622 Account.

59. The Bank Secrecy Act, the Patriot Act and New York laws and regulations also required Defendants to maintain rigorous anti-money-laundering policies and procedures.

60. Because of its participation in the Enron fraud, Defendants were required to be more vigilant in overseeing and reporting suspicious activity in the 622 Account. If they had followed their purported improved procedures, the regulators would have had information that would have led to the uncovering of the Ponzi/embezzling scheme as the only plausible explanation for Haddow and Bar Works Inc.'s suspicious activities.

61.    Indeed, federal legislation and regulations have long required banks to have an AML program. One element of these programs is monitoring customer account activity in order to detect possible fraud, money laundering, or other improper activity. These requirements were first established by the Bank Secrecy Act ("BSA") and federal banking regulations. 31 U.S.C. §5311; 12 C.F.R. § 208.63. All of the federal banking agencies have substantially identical requirements. Those parts of Defendants under the supervision of the OCC would thus have the same obligations. The Patriot Act reinforced these obligations and underscored the importance of implementing robust detection systems to ensure that money launderers and terrorists would not be able to use the United States financial system to further their crimes.

62.    One purpose of these requirements is to ensure that banks, which are often in the best position to identify potentially illegal activity, will closely observe the transactions taking place in their clients' accounts. The legislation and regulations also provide guidance to banks and other financial institutions regarding how to best achieve that goal, and what actions to take once suspicious activity is identified.

63.    Section 352 of the Patriot Act and the banking regulations require financial institutions to institute an AML program that includes four pillars: (i) designating an individual or individuals responsible for managing BSA compliance; (ii) a system of policies, procedures, and internal controls to ensure ongoing compliance; (iii) training for appropriate personnel; and, (iv) independent testing of compliance. 12 C.F.R. § 208.63.

64.    Financial institutions must also fully understand the business in which their customers are engaged. This duty, referred to as the responsibility to "know your customer" ("KYC"), is critical to determining what activity was suspicious. 12 C.F.R. § 208.62.

15

65.     Institutions viewing account activity need a baseline against which to distinguish account activity that may be normal for a particular industry from account activity that might suggest an illegal enterprise. The KYC duty also pre-dated the Patriot Act. Not only was it suggested by such guidelines as the Federal Reserve's BSA Examination Manual of 1995 and Supervisory Letter on Private Banking Activities, SR 97-19 (SUP), but it was standard industry practice.

66.     This regulatory guidance directed financial institutions like Defendants to perform on- site visits to their clients, obtain and review financial statements to corroborate the sources of the clients' wealth, and to review media reports regarding their clients.

67.     It was also standard industry practice for financial institutions to perform KYC on their clients. Many financial institutions have entire departments devoted to this one task and to making sure KYC is performed thoroughly and is constantly monitored and recorded. Upon information and belief, Defendants have a KYC department for each of its lines of business.

68.     While Defendants may have created AML and KYC programs that facially met the requirements of the Patriot Act and related regulations, Defendants did not effectively execute those programs and never submitted to the appropriate banking regulators as mandated by statute and regulation any reports of Haddow and Bar Works Inc.'s suspicious activities.

69.     Not only did Defendants fail to "know" Haddow or Bar Works Inc., but it also failed to investigate activity that was suspicious regardless of whether Defendants thought Haddow and Bar Works Inc. were using the 622 Account to operate a legitimate co-working business.

70.     Defendants knew that the transaction activity in the 622 Account could not have been linked to a legitimate business purpose, and this fact should have been flagged by both Defendants' personnel and its automated monitoring system.

71. If Defendants had believed Haddow was using the 622 Account for a legitimate co-working space business, the bank would have likely seen regular transactions for building out retail spaces, e.g. large payments to contractors, vendors, suppliers, payroll.

72. Instead, what Defendant saw was massive outflows of money that were in no way linked to a legitimate retail business operation. A majority of funds would then exit the account many to known money laundering destinations.

73. Defendants were therefore aware that Haddow was not using the money in the 622 Account to build a legitimate retail location co-working space business.

74. Defendants also faced regular account activity that would have been suspicious regardless of the type of business Defendants thought Haddow was running. The Office of the Comptroller of the Currency's 2000 BSA/AML Handbook identified numerous "red flags" that financial institutions needed to consider as part of their transaction monitoring procedures. These red flags included: (i) unexplained repetitive or unusual patterns of activity; (ii) frequent large dollar transactions without corresponding explanations as to how those funds would be utilized; (iii) spikes in customer activity with little or no explanation; and (iv) wire activity with offshore banking centers or financial secrecy havens. The 622 Account exhibited clear examples all of these types of transactions, and exhibited them repeatedly.

75. The activity in the 622 Account was not only inconsistent with Bar Works Inc.' stated business, but it would have been suspicious in *any* context.

76. The 622 Account repeatedly exhibited textbook "red flags" and high risk activity including:

        a. *Repetitive Transactions:* Haddow frequently engaged in repeated transactions with the same parties, often on the same days, with no obvious purpose.

     *b.*     *Large Dollar Transactions:* The 622 Account reflected a pattern of large dollar transactions. These transactions represented a large percentage of the wires that flowed out of the 622 Account.

     *c.*     *Spikes in Activity:* The 622 Account showed occasional spikes in overall activity, which should have prompted further investigation by Defendants. This increase in activity included a significant increase not only in third-party wires but also in book-transfer activity.

     *d.*     *Wire Activity with Offshore Entities:* Through the 622 Account, Haddow frequently engaged in transactions with high risk, offshore entities, such as so-called "binary trading" operations.

     *e.*     *Personal Expenditures:* Through the 622 Account, Haddow frequently used the Bar Works Inc. account for lavish personal expenditures, including, among other items, shopping sprees and luxury car purchases.

77.     Knowing that the activity in the 622 Account was not consistent with the purported business purpose of the account, and faced with evidence that illegal activity was occurring, Defendant had a duty to take action, not to participate in a breach of fiduciary duty, and to prevent the further theft of fiduciary assets.

78.     In light of the above information, Defendants' failure to fully and accurately report to regulators was intentional and is evidence of conscious misbehavior on the part of Defendants.

## COUNT ONE
## KNOWING PARTICIPATION IN A BREACH OF TRUST

79.     The preceding paragraphs are realleged and incorporated by reference as if set forth fully herein.

80.     The various "Bar Works" entities had fiduciary duties to their investors.

81.     Haddow and/or the various "Bar Works" entities were in a position of superior knowledge and expertise to their investors, who reposed their trust and confidence in the Bar Works Entities.

82.     This created a relationship of high trust and confidence whereby the Bar Works Entities, and ultimately Bar Works Inc. was/were entrusted with Plaintiffs investment funds deposited into the 622 Account.

83.     The Defendants knew that Haddow and/or Bar Works Inc. were accepting investment funds from investors, including the Plaintiffs, and in that capacity were using the 622 Account as a fiduciary account.

84.     Haddow, Bar Works Inc. and/or the Bar Works Entities breached this trust by embezzling Plaintiffs' investment funds in the 622 Account.

85.     The Defendants knew that Haddow, Bar Works Inc. and/or the Bar Works Entities were breaching their fiduciary duties by embezzling the customer funds in the 622 Account.

86.     At a minimum, the Defendants knew of suspicious transactions in the 622 Account that would have led a reasonably prudent person to suspect that Haddow, Bar Works Inc. and/or the Bar Works Entities were embezzling the funds of Plaintiffs, and the Defendants failed to inquire whether Haddow, Bar Works Inc. and/or the Bar Works Entities were embezzling those funds.

87.     Reasonable inquiry would have revealed that the only plausible explanation for the suspicious transactions was that Haddow, Bar Works Inc. and/or the Bar Works Entities were embezzling customer funds in breach of their fiduciary duties.

88.     The Defendants knew that the transactions taking place in the 622 Account did not coincide with any legitimate enterprise, and thus could only plausibly be explained by embezzlement.

89.     The Defendants were also aware of highly suspicious activity in the 622 Account, as set forth herein, including: the absence of legitimate business activity related to a retail co-working space operation, and the distribution of Plaintiffs' funds to other investors; large, repetitive transactions; up and down spikes in the value and volume of transactions; and frequent transactions with offshore entities;

90.     Upon information and belief, the Defendants' automated transaction monitoring system alerted the Defendants to this unusual activity.

91.     After performing minimal due diligence on Haddow, Bar Works Inc. and/or the Bar Works Entities, the Defendants knew Haddow was a known fraudster and was engaging in embezzlement.

92.     Defendants knew that Haddow, Bar Works Inc. and/or the Bar Works Entities began paying investors a "return" on their investment prior to any co-working retail operations being opened, meaning, the only source of funds available to pay these "returns" were the investment funds of other investors (i.e. he was running a textbook Ponzi).

93.     The Defendants are therefore liable for all funds Haddow, Bar Works Inc. and/or the Bar Works Entities misappropriated from the 622 Account after the point at which the Defendants knew or through reasonable inquiry would have known that Haddow, Bar Works Inc. and/or the Bar Works Entities were embezzling those funds.

94.     As a result of the Defendants' knowing participation in this breach of trust, Plaintiffs lost millions of dollars. At a minimum, the Defendants' actions resulted in a loss of approximately $3,050,000.00.

95.     As a direct and proximate result of Defendants' knowing participation in breach of trust, Plaintiffs lost their investment capital, and suffered damages in an amount to be proven at trial.

## COUNT TWO
## AIDING AND ABETTING EMBEZZLEMENT

96.     The preceding paragraphs are realleged and incorporated by reference as if set forth fully herein.

97.     Haddow committed a massive embezzling scheme through the Bar Works Entities.

98.     The Defendants had actual knowledge of the scheme and provided substantial assistance to Haddow, Bar Works Inc. and/or the Bar Works Entities in committing the scheme.

99.     The Defendants' actions proximately caused the scheme that resulted in millions of dollars in damages to Plaintiffs and other investors of the Bar Works Entities.

100.     Plaintiffs bring this claim against Defendants because, upon information and belief, each Defendants aided and abetted the embezzlement scheme.

101.     In addition, both Defendants operated as a single, indivisible entity. Therefore, each of the Defendants is liable for the actions of the other Defendants.

102.     Haddow committed a large Ponzi scheme through Bar Works Inc. and the Bar Works Entities.

103.     The Defendants knew, or at least consciously avoided knowledge of the embezzling scheme.

104. The Defendants knew that the transactions taking place in the 622 Account did not coincide with any legitimate enterprise, and thus could only be plausibly explained by embezzlement.

105. Upon information and belief, after performing minimal due diligence on Haddow, Bar Works Inc. and/or the Bar Works Entities, the Defendants knew Haddow, through Bar Works Inc. and the Bar Works Entities, was embezzling customers' monies.

106. The Defendants knew Haddow was embezzling. At a minimum, the Defendants were repeatedly faced with evidence that there was a high probability of embezzling, and made a conscious decision not to confirm that fact.

107. The Defendants substantially assisted Haddow through Bar Works Inc. and the Bar Works Entities in committing embezzlement by allowing Haddow through Bar Works Inc. and the Bar Works Entities to use the 622 Account to run the Ponzi scheme; executing transfers at Haddow, Bar Works Inc. and/or the Bar Works Entities' behest, that were necessary for the operation of the Ponzi and embezzling scheme; choosing not to execute or to ignore its AML policy, which it touted to its customers; ignoring instances of irregular activity in the 622 Account.

108. The Defendants' assistance was a proximate cause of the Ponzi/embezzlement scheme. Without the Defendants' assistance, Haddow, Bar Works Inc. and/or the Bar Works Entities would not have been able to continue to operate the scheme.

109. As a result of the Defendants' aiding and abetting Haddow, Bar Works Inc. and/or the Bar Works Entities' embezzling, investors of the Bar Works Entities lost millions of dollars. At a minimum, the Defendants' actions resulted in a loss of approximately $3,050,000.00 in Plaintiffs' direct investment proceeds.

110.    As a direct and proximate result of Defendants' activities, Plaintiffs lost their investment capital, and suffered damages in an amount to be proven at trial.

## COUNT THREE
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

111.    The preceding paragraphs are realleged and incorporated by reference as if set forth fully herein.

112.    Haddow, Bar Works Inc. and/or the Bar Works Entities owed a fiduciary duty to the Plaintiffs.

113.    Haddow, Bar Works Inc. and/or the Bar Works Entities breached that fiduciary duty by perpetrating a massive Ponzi scheme through which they embezzled tens of millions of dollars from the Bar Works Entities' investors, including Plaintiffs.

114.    Defendants knowingly participated in the breach, causing harm to Plaintiffs.

115.    At a minimum, the Defendants consciously avoided knowledge of the breach.

116.    Plaintiffs bring this claim against both Defendants because, upon information and belief, each Defendant, individually, aided and abetted the breach of fiduciary duty by Haddow, Bar Works Inc. and/or the Bar Works Entities.

117.    In addition, all of the Defendants operated as a single, indivisible entity. Therefore, each of the Defendants is liable for the actions of the other Defendants.

118.    Haddow, Bar Works Inc. and/or the Bar Works Entities were in a fiduciary relationship with Plaintiffs.

119.    Haddow, Bar Works Inc. and/or the Bar Works Entities were in a superior position over the Plaintiffs, which required those customers to repose trust and confidence in the Bar Works

Entities. In addition, Haddow created a fictitious person, "Jonathan Black", to hide his existence from Bar Works Entities' investors, including the Plaintiffs.

120.    Defendants were aware of Haddow's involvement, his use of a fictitious executive in his place, and Haddow's checkered past.

121.    The Bar Works Entities agreed to take Plaintiffs' investment money and invest it into the "Bar Works" business. Instead, Haddow, Bar Works Inc. and/or the Bar Works Entities embezzled from Plaintiffs by taking their money and using it to benefit Haddow and other individuals and businesses close to him.

122.    The Defendants knew Haddow, Bar Works Inc. and/or the Bar Works Entities had a fiduciary duty to the Plaintiffs and that Haddow, Bar Works Inc. and/or the Bar Works Entities breached that duty.

123.    The Defendants also knew, or at least consciously avoided the knowledge that, Haddow, Bar Works Inc. and/or the Bar Works Entities breached that fiduciary duty by engaging in embezzlement.

124.    The Defendants knew that the transactions taking place in the 622 Account did not coincide with any legitimate enterprise, and thus could only plausibly be explained by embezzlement.

125.    Upon information and belief, after performing minimal due diligence on Haddow, Bar Works Inc. and/or the Bar Works Entities, the Defendants knew Haddow, Bar Works Inc. and/or the Bar Works Entities were engaging in embezzlement.

126.    The Defendants knew Haddow, Bar Works Inc. and/or the Bar Works Entities were breaching a fiduciary duty to Plaintiffs.

127.   The Defendants participated in, and provided substantial assistance to, Haddow, Bar Works Inc. and/or the Bar Works Entities' breach of fiduciary duty by, among other things: allowing Haddow, Bar Works Inc. and/or the Bar Works Entities to use the 622 Account to run the Ponzi/embezzling scheme and executing transfers at Haddow's behest; choosing not to execute its AML policy, which it touted to its customers.

128.   The Defendants' assistance was a proximate cause of the breach.

129.   Without the Defendants' assistance, Haddow, Bar Works Inc. and/or the Bar Works Entities would not have been able to continue to operate the Ponzi/embezzling scheme.

130.   As a result of the Defendants' aiding and abetting this breach of fiduciary duty, Plaintiffs lost millions of dollars.

**COUNT FOUR**
**AIDING AND ABETTING CONVERSION**

131.   Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth fully herein.

132.   Haddow, Bar Works Inc. and/or the Bar Works Entities converted millions of dollars of Plaintiffs' money.

133.   Plaintiffs have a legal right and interest in the millions of dollars they personally invested with the Bar Works Entities.

134.   Haddow, Bar Works Inc. and/or the Bar Works Entities exercised unauthorized dominion and control over this customer property in derogation of Plaintiffs' rights by failing to invest customer property pursuant to private placement style memorandum provided to Plaintiffs, which Defendants had seen.

135.    Instead, Haddow, Bar Works Inc. and/or the Bar Works Entities used Plaintiffs' money for Haddow's personal expenses, to make payments to friends, family and business associates, and laundered Plaintiffs' money to overseas banking havens.

136.    Haddow, Bar Works Inc. and/or the Bar Works Entities' unauthorized use of customer property resulted in the wrongful conversion of Plaintiffs' specifically identifiable funds.

137.    Defendants had actual knowledge of the conversion and lent substantial assistance to Haddow, Bar Works Inc. and/or the Bar Works Entities in converting these monies. Defendants had actual notice that Haddow, Bar Works Inc. and/or the Bar Works Entities were converting Plaintiffs' money, but refrained from stopping the conversion in order to continue charging substantial fees.

138.    Defendants' actions proximately caused the conversion that resulted in millions of dollars in damages to Plaintiffs.

139.    Defendants, through their Know Your Customer protocols, was aware that Haddow was under investigation in the United Kingdom, for his involvement in a similar pooled investment scheme.

140.    Haddow, Bar Works Inc. and/or the Bar Works Entities converted millions of dollars of Plaintiffs' money.

141.    Each of the Bar Works Entities, in their private placement style memorandum, represented to Plaintiffs that it would invest Plaintiffs' money into a legitimate co-working space business, but instead embezzled that money.

142.    Defendants knew that Haddow, Bar Works Inc. and/or the Bar Works Entities did not invest Plaintiffs' money into a legitimate co-working space business, but instead embezzled that money.

143.    Defendants' assistance was a proximate cause of the conversion. Without it, Haddow, Bar Works Inc. and/or the Bar Works Entities would not have been able to continue to operate the Ponzi/embezzling scheme.

144.    As a result of the Defendants' aiding and abetting Haddow, Bar Works Inc. and/or the Bar Works Entities' conversion, Plaintiffs lost millions of dollars. At a minimum, the Defendants' actions resulted in a loss of approximately $3,050,000.00. As a direct and proximate result of Defendants' activities, Plaintiffs lost their investment capital, and suffered damages in an amount to be proven at trial.

## COUNT FIVE
## UNJUST ENRICHMENT

145.    Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth fully herein.

146.    Defendants have unjustly benefitted through its receipt of customer property (through charging extensive transaction fees) that Defendants acquired only as a result of perpetuating and participating in Haddow, Bar Works Inc. and/or the Bar Works Entities' Ponzi/embezzling scheme.

147.    Defendants received tens of thousands of dollars from Bar Works Inc. in the form of transaction fees.

148.    Defendants also benefitted from customer property by receiving deposits of this property into the 622 Account.

149.    Defendants earned these benefits at the expense of the Plaintiffs, and cannot justly retain them.

150.    Faced with the prospect of losing fees and profits, Defendants chose to ignore compelling evidence of Haddow, Bar Works Inc. and/or the Bar Works Entities' embezzling scheme.

151.    For example, Defendants were privy to the abnormal activity in the 622 Account, and a plethora of other evidence of embezzling, as detailed above.

152.    Defendants helped perpetuate Haddow, Bar Works Inc. and/or the Bar Works Entities' embezzling by ignoring the evidence of embezzling and continuing to use the customer property in the 622 Account for its own enrichment.

153.    Equity and good conscience require full restitution of the monies received by Defendants, directly and indirectly, from Bar Works Inc. and/or the Bar Works Entities.

154.    This includes profits made from its use of this money.

155.    Additionally, any profits and fees Defendants earned through its use of the customer property deposited in the 622 Account is recoverable by the Plaintiffs.

156.    At a minimum, the Defendants' actions resulted in a loss of approximately $3,050,000.00.

157.    As a direct and proximate result of Defendants' activities, Plaintiffs lost their investment capital, and suffered damages in an amount to be proven at trial.


## COUNT SIX
## COMMERCIAL BAD FAITH

158.    Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth fully herein.

159.    Defendants had actual knowledge of the facts and circumstances of the illegitimate scheme by Haddow, Bar Works Inc. and/or the Bar Works Entities.

160.    Defendants acted in commercial bad faith by facilitating that scheme by continuing to provide banking services to the various "Bar Works" entities without any meaningful investigation.

161.    As a direct and proximate result of Defendants' actions in commercial bad faith, Plaintiffs lost their investment capital and suffered damages in an amount to be proven at trial.

## COUNT SEVEN
## GROSS NEGLIGENCE

162.    Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth fully herein.

163.    Based upon Defendants' actual knowledge of the facts and circumstances of Haddow, Bar Works Inc. and/or the Bar Works Entities' illegal scheme, Defendants had a duty thoroughly to investigate Haddow and Bar Works Inc. under relevant law and prudent business practices and, when it failed to receive credible explanations from Haddow and Bar Works Inc., Defendants should have closed the 622 Account and notified authorities.

164.    Defendants' failure to close the 622 Account and notify authorities was, in the circumstances, grossly negligent.

165.    As a direct and proximate result of Defendants' gross negligence, Plaintiffs lost their investment capital and suffered damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Awarding compensatory and/or consequential damages, and as permitted by law, exemplary and punitive damages, in favor of Plaintiffs, against both Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in specific

amounts of compensatory, exemplary and punitive damages to be determined at trial, including interest and any enhanced damages thereon;

B.  Awarding Plaintiffs restitution of monies DEFENDANTS received from Haddow and/or the various "Bar Works" entities and any profits earned through DEFENDANTS's use of these monies;

C.  Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.  Such other and further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated:  September 27, 2017
        New York, New York

Yours, etc.,

MICHAEL J. KAPIN, P.C.
*Attorney for Plaintiffs*

MICHAEL J. KAPIN, ESQ. (MK 1234)
305 Broadway - Suite 1004
New York, New York 10007
(212) 513-0500

UNITED STATES DISTRIC COURT
SOUTHERN DISTRICT OF NEW YORK

HONGYING ZHAO, JUAN LIU, SHENSI HE,
HONGLEI TIAN, HAIYAN WANG, JINMEI
WANG, YIHE SUN, SHAOMIN LU, GE GAO,
KUNYUN ZHANG, FENGWEI WANG,
DANDONG WU, XIAOLI WANG, PENG WANG,
YIMIN YANG, JINGRUI FENG, LING SHEN,
CUIRONG LI, HUI ZHENG, CHANGLI XIAO,
QIUYUE ZU, XIUHUA WANG, XIAOYUN
ZHANG, JINLI QIN, SHUYAN FENG, KANWEN
ZHANG and QIAN LU,

Docket No.:

                                    Plaintiffs,

                    -against-                              **DECLARATION**

JPMORGAN CHASE & CO. and JPMORGAN
CHASE BANK, N.A.,

                                    Defendants.

P.R. CHINA          )
                    ) ss.:
BEIJING             )

     **JINMEI WANG**, being duly sworn, deposes and states: I am an individual plaintiff in this matter.

I have read the VERIFIED COMPLAINT in its entirety, and can declare and verify such as true, except as

to those statements made upon information and belief, and as to those I believe them to be true.

     The basis and foundation of this declaration and verification is my personal knowledge, together

with my books, records, and documents, as well as conversations with other individual plaintiffs and review

of their records.

Sworn to before me this
_____ day of September, 2017

_____
Notary Public

_____ JINMEI WANG
JINMEI WANG

2017. 9. 28

# 公　证　书

## 中华人民共和国北京市信德公证处

# 公　证　书

（2017）京信德外民证字第 18397 号

申请人：王金梅，女，一九七三年十月三十日出生，公民身份号码：210821197310303063。

公证事项：签名

兹证明王金梅于二〇一七年九月二十八日来到我处，在本公证员的面前，在前面的《确认书》上签名。

中华人民共和国北京市信德公证处

公证员 



二〇一七年九月二十八日

IV09542886

# NOTARIAL CERTIFICATE

(Translation)

(2017) J.X.D.W.M.Z.Zi, No.18397

Applicant: Wang Jinmei, female, born on October 30, 1973, ID Card No.: 210821197310303063

Matter for Notarization: Signature

This is to certify that Wang Jinmei came to my office on September 28, 2017 and affixed her signature in the presence of this notary on the DECLARATION attached hereto.

Notary: Xian Fangfang
Beijing Xinde Notary Public Office
The People's Republic of China
September 28, 2017

公　　证　　书

（2017）京信德外民证字第 18398 号

　　申请人：王金梅，女，一九七三年十月三十日出生，公民
身份号码：210821197310303063。
　　公证事项：译本与原本相符
　　兹证明前面的(2017)京信德外民证字第 18397 号公证书
所附的英文译本内容与中文原本内容相符。

中华人民共和国北京市信德公证处

公证员 

二〇一七年九月二十八日

IV09556485

# NOTARIAL CERTIFICATE
(Translation)

(2017) J.X.D.W.M.Z.Zi, No.18398

Applicant: Wang Jinmei, female, born on October 30, 1973, ID Card No.: 210821197310303063

Matter for Notarization: The Conformity of the English Version with the Chinese Original

This is to certify that the English version of (2017) J.X.D.W.M.Z.Zi, No.18397 NOTARIAL CERTIFICATE attached hereto is in conformity with its Chinese original.

Notary: Xian Fangfang
Beijing Xinde Notary Public Office
The People's Republic of China
September 28, 2017